## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 38307

PACIFICORP,

    Petitioner-Respondent,

v.

IDAHO STATE TAX COMMISSION,

    Respondent-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

Boise, August 2012 Term

2012 Opinion No. 153

Filed: December 24, 2012

Stephen W. Kenyon, Clerk

_____

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. George D. Carey, Senior District Judge.

The judgment of the district court is <u>affirmed</u>. Costs are awarded to PacifiCorp.

Hon. Lawrence Wasden, Idaho Attorney General, Boise, for Appellant. Carl E. Olsson argued.

Wood Jenkins LLC and Crapo Smith PLLC, Salt Lake City, Utah, for Respondents. David Crapo argued.

_____

W. JONES, Justice

### I. NATURE OF THE CASE

The Idaho State Tax Commission ("the Commission") appeals the Judgment of the district court, holding that PacifiCorp, an Oregon corporation, proved by a preponderance of the evidence that the Commission's valuation of its taxable operating property in Idaho was erroneous pursuant to I.C. § 63-409(2). The Commission contends that the district court's decision is not supported by substantial and competent evidence because the appraisal methodologies utilized by PacifiCorp's appraiser are so unreliable as to amount to incompetent evidence.

### II. FACTUAL AND PROCEDURAL BACKGROUND

PacifiCorp is a regulated electric utility that operates hydroelectric, wind, and thermal generating plants in Arizona, California, Colorado, Idaho, Montana, Oregon, Utah, Washington, and Wyoming. It provides electrical power to approximately 7.1 million customers. PacifiCorp also owns, or has interests in, electric transmission and distribution assets.

1

On March 21, 2006, a wholly owned subsidiary of MidAmerican Energy Holdings Company ("MidAmerican") acquired 100% of the common stock of PacifiCorp from a wholly owned subsidiary of ScottishPower, plc, ("ScottishPower"), a public limited company in the United Kingdom, for a reported value of $9,200,000,000—of which $5,100,000,000 was paid in cash with $4,100,000,000 in net debt and preferred stock to remain outstanding. ScottishPower primarily caused its subsidiary to sell PacifiCorp due to a forecasted $5,000,000,000 investment needed over the next five years to update its infrastructure. As such, PacifiCorp's current business profile did not match well with its investors' expectations for dividends and returns.

As a result of the sale, MidAmerican through its subsidiary now controls all the voting securities of PacifiCorp, including all of its common and preferred stock. MidAmerican is a subsidiary and holding company of Berkshire Hathaway, Inc. ("Berkshire Hathaway"), and is engaged in the energy business. Berkshire Hathaway primarily caused its subsidiary to purchase PacifiCorp as part of its long term investment strategy in electric power.

PacifiCorp is subject to comprehensive regulation by the Federal Energy Regulatory Commission ("FERC") and other local, state, and federal regulatory agencies. FERC requires PacifiCorp to submit a FERC Financial Report. This report includes FERC Form No. 1, which comprises an annual regulatory financial reporting requirement of major electric companies, and FERC Form No. 3-Q, which is a quarterly regulatory requirement that supplements the financial reporting requirement (hereinafter FERC Form No. 1 and FERC Form No. 3-Q shall be referred to collectively as "the FERC Form"). 18 C.F.R. §§ 141.1, 141.400 (2007). Several provisions in the FERC Form account for depreciation. The Code of Federal Regulations, in 2007, defined "depreciation" as applied to a depreciable electric plant as follows:

> [T]he loss in service value not restored by current maintenance, incurred in connection with the consumption or prospective retirement of electric plant in the course of service from causes which are known to be in current operation and against which the utility is not protected by insurance. Among the causes to be given consideration are wear and tear, decay, action of the elements, inadequacy, *obsolescence*, changes in the art, changes in demand and requirements of public authorities.

18 C.F.R. § 101.12 (2007) (emphasis added). Both parties dispute whether "depreciation" in the FERC Form accounts for (1) all forms of obsolescence, or (2) merely depreciation and functional obsolescence, which is "[o]bsolescence that results either from inherent deficiencies in the property . . . or from technological improvements available after the use began." Black's Law Dictionary 1182 (9th ed. 2009).

2

PacifiCorp's rates are based on a revenue requirement that the Idaho Public Utilities Commission (IPUC) determines should provide it with the opportunity to recover its operating costs and earn a reasonable market return on its invested capital ("the rate base").[1] The rates are not subject to change unless a new rate case is filed with the IPUC and the IPUC orders a modified rate base. Rate regulation also affects PacifiCorp's earnings because the investments allowed to be included in the rate base vary between jurisdictions. For example, the IPUC excludes assets financed with deferred income taxes from the rate base. PacifiCorp has also incurred increased operating costs and engaged in significant investments in property and equipment that are not automatically included in the rate base due to the infrequencies of rate cases and regulatory lag. PacifiCorp contends that primarily because of rate regulation, its average net rate of return on its plant in service has been 7.2% over the five years immediately preceding January 1, 2008, while the investor required rate of return for the regulated electric utility industry has been 9.1%. As a result, PacifiCorp contends that its net rate of return or actual rate of return as of January 1, 2008, was 20.88% less than the market rate of return.

For ad valorem tax purposes, operating property in Idaho is annually assessed at market value as of 12:01 a.m. of the first day in January in the year in which such property taxes are levied. I.C. § 63-205(1). The tax involved in this appeal is the ad valorem property tax on PacifiCorp's operating property in Idaho as of the valuation date of January 1, 2008. With regard to electric utilities, "operating property" includes

> [A]ll rights-of-way accompanied by title . . . and all immovable or movable property operated in connection with any public utility . . . wholly or partly within this state, and necessary to the maintenance and operation of such road or line, or in conducting its business, and shall include all title and interest in such property, as owner, lessee or otherwise . . . .[2]

I.C. § 63-201(15) (2007). Market value is defined as follows:

> [T]he amount of United States dollars or equivalent for which, in all probability, a property would exchange hands between a willing seller, under no compulsion to

---

[1] It should be noted the IPUC, not the Idaho State Tax Commission, sets the rate base and enters orders regarding the rate base. Further, the IPUC only determines rates within Idaho.

[2] Idaho Code section 63-201 was amended in 2008. With regard to electric utilities, it states, in relevant part, that "operating property" consists of "real and personal property operated in connection with . . . [the] utility . . . wholly or partly within this state, and which property is necessary to the maintenance and operation of the . . . utility . . . ." I.C. § 63-201(16).

sell, and an informed, capable buyer, with a reasonable time allowed to consummate the sale, substantiated by a reasonable down or full cash payment.[3]

I.C. § 63-201(14) (2007). In determining market value, an assessor will consider the comparable sales approach, the cost approach, and the income approach. IDAPA 35.01.03.217.02. Furthermore, with regard to an electric utility's operating property, the unit method of market valuation is preferred. IDAPA 35.01.03.405.01. The unit method values operating properties by measuring their contribution to the overall unit. Under the unit method, "the value of the tangible and intangible property is equal to the value of the going concern . . . . For interstate property, allocation factors shall be used to determine what part of the system value is in Idaho." *Id.* "The appraiser shall attempt to measure obsolescence, if any exists. If obsolescence is found to exist, it may be considered in the cost approach." IDAPA 35.01.03.405.05.c. Obsolescence is defined as "[a] diminution in the value or usefulness of property . . . ." Black's Law Dictionary 1182 (9th ed. 2009). For tax purposes, obsolescence is usually distinguished from physical deterioration or depreciation. Black's Law Dictionary 1182 (9th ed. 2009). External obsolescence (also referred to as economic obsolescence) "results from external economic factors, such as decreased demand or changed governmental regulations." Black's Law Dictionary 1182 (9th ed. 2009).

On June 16, 2008, the Commission completed an appraisal of PacifiCorp's operating property for the tax year beginning on January 1, 2008, which was prepared by Jerott Rudd, Senior Appraiser with the Commission's Central Assessment Bureau. With regard to the cost approach, Rudd utilized the historic cost less depreciation methodology ("HCLD Method"), which is a commonly employed cost approach. To arrive at his cost approach estimate, Rudd primarily relied on PacifiCorp's FERC Form for the period ending in December 31, 2007. Rudd did not provide a separate deduction for external obsolescence. He elaborated that "[he] believe[s] . . . [external obsolescence] was accounted for . . . in the depreciation [as reported in the FERC Form]. Rudd testified that market to book value is a strong indicator of obsolescence. Rudd also testified that he would have considered accounting for additional external obsolescence if there was market evidence to support such a deduction, but he added "[that] . . . the market evidence that [he] had for PacifiCorp . . . did not indicate obsolescence."

Rudd's appraisal estimated a cost approach market value of $11,122,536,280. (With regard to the income approach, Rudd utilized the yield capitalization of net operating income

---

[3] That section was amended in 2008. It is now found in subsection (15) in I.C. § 63-201.

methodology ("Yield Capitalization Method") to arrive at his estimate of $6,761,521,809. Rudd did not employ the comparable sales approach because he contended that there were no comparable sales of similar operating properties. Rudd did not utilize the comparable sales approach's counterpart, the stock and debt approach, which is often used by appraisers when the comparable sales approach is inapplicable, because PacifiCorp's stock is not outstanding and because of the significant premium which MidAmerican paid for the investment value of PacifiCorp.

Rudd placed a 45% weight on his cost approach estimate and a 55% weight on his income approach estimate, resulting in a unit value of $9,273,982,721. He explained why he applied those weights to the cost and income approaches:

> Historically, for many years, the Tax Commission applied a 50/50 weighting to the cost and income for electric utility properties. That 50/50 weighing I believe was upheld by the Board of Equalization decisions in the past. In 2007, I . . . changed the weighting slightly to a 45/55 weighting. I felt that I could still do that.

Rudd reduced the market value by $240,761,350 for the value of PacifiCorp's non-taxable intangible property. He multiplied that figure by the Idaho allocation factor of 3.745822% ("the allocation factor") to obtain an Idaho allocated value of $338,368,433. Additional adjustments for various deductions and exemptions resulted in a final estimated Idaho taxable valuation of $263,667,243.

PacifiCorp appealed Rudd's appraisal to the Commission, pursuant to I.C. § 63-407, asserting that it was entitled to an adjustment for functional and external obsolescence in the cost approach, and that the capitalization rate applied in Rudd's appraisal incorrectly estimated the cost of equity. The Commission held that the market value of PacifiCorp's operating property was to be set at $8,877,075,014 for ad valorem tax purposes. It further ordered that the Idaho taxable value for that property was to be set at $252,382,819. In reaching its valuation, the Commission determined that 7.93% should be deducted from the cost approach valuation for additional obsolescence, resulting in a cost approach value of $10,241,519,153. No adjustments were made to Rudd's income approach estimate. After weighing the Commission's adjusted cost approach valuation and Rudd's unadjusted income approach valuation by 45% and 55%, respectively, the Commission concluded that for the 2008 tax year, the market value of PacifiCorp's operating property was $8,877,075,014, which was reduced by $230,457,249 for the value of non-taxable intangible property. The result was then multiplied by the allocation

5

factor and additional adjustments for various deductions and exemptions were made, resulting in a final Idaho taxable value of PacifiCorp's operating property of $252,382,819.[4]

Thereafter, PacifiCorp timely filed a Petition for Judicial Review, pursuant to I.C. § 63-409, with the district court on September 24, 2008, contending that the Commission's valuation was erroneous. At trial, PacifiCorp relied primarily on the appraisal of Thomas K. Tegarden of Tegarden & Associates, Inc., an MAI appraiser and expert in utility valuation. Norman Ross,[5] a Tax Director with PacifiCorp, who is accredited in business valuation and a certified public accountant, and Steven McDougal,[6] Director of Revenue Requirements with PacifiCorp, also provided their expert opinions as to the validity of Tegarden's appraisal and the value of PacifiCorp's operating property at trial.

In his appraisal, Tegarden estimated that the fair market value of PacifiCorp's operating property was $8,350,000,000. Tegarden utilized the same valuation methodologies for the cost and income approaches that were employed by Rudd: the HCLD Method and Yield Capitalization Method, respectively.[7] Tegarden did not utilize the comparable sales approach or the stock and debt approach. Concerning his decision not to employ the comparable sales approach, Tegarden stated that there is very limited actual sales data for valuing public utilities in general and that the 2006 sale of PacifiCorp represented a significant investment value premium. When PacifiCorp was sold in 2006, ScottishPower wanted to unload PacifiCorp, which it acquired in 1999, because it would have had to invest $5,000,000,000 in infrastructure over the next half decade, which would take away cash dividends from its investors. ScottishPower was

---

[4] The district court incorrectly stated that the Commission's final Idaho taxable value of PacifiCorp's operating property was $252,382,129. (Attach. F, at 61.) The actual Idaho taxable value determined by the Commission was $252,382,819.

[5] Norman Ross, Tax Director with PacifiCorp, is accredited in business valuation and a certified public accountant. He testified that PacifiCorp's goal is to achieve a market rate of return on its investments, which he contended had been difficult, if not impossible, to achieve due to allocation issues, the economy, and rate regulation. He further testified that Rudd's and Eyre's cost approach is deficient because it relies too heavily on book depreciation.

[6] Steven McDougal, Director of Revenue Requirements with PacifiCorp, testified that PacifiCorp has not been earning its allowed rate of return for a number of years due to many external factors. He opined that as of December of 2007, PacifiCorp was experiencing a return on rate base of 7.467%, while the allowed rate of return was near 10.2% to 10.6%. With regard to the depreciation reported in the FERC Form, he stated that the obsolescence referred to in that filing is really functional obsolescence, meaning it has to do with the functional characteristics of the asset. He also testified that Eyre's and Rudd's appraisals rely too heavily on book value with regard to their cost approach to valuation. McDougal is not a certified appraiser and never expressed any opinion of value.

[7] Tegarden testified that his unit appraisal complied with the Uniform Standards of Professional Appraisal Practice.

6

also concerned about the movement in the United States away from deregulation and PacifiCorp's inability to achieve a market required rate of return. Tegarden recognized that Berkshire Hathaway caused its subsidiaries to purchase PacifiCorp to further its long term investment strategy in electric utilities, and that the price paid for PacifiCorp represented more of an investment value price rather than the market value price of PacifiCorp. With regard to the stock and debt approach, Tegarden stated that this approach was inapplicable for many of the same reasons the comparable sales approach was inapplicable and because PacifiCorp had no securities outstanding.

With regard to Tegarden's cost approach, he estimated that the value of PacifiCorp's operating assets was $8,811,000,000. Tegarden used the figures supplied in the FERC Form to determine the historical cost of the operating assets and the physical depreciation and functional obsolescence of those assets, resulting in a figure of $11,135,919,587. He thereafter made adjustments for external obsolescence, which he contends amounted to an additional 20.88% deduction, or $2,325,180,010. Tegarden arrived at his external obsolescence estimate by using the capitalization of income loss method, which is a generally accepted methodology. Tegarden characterized external obsolescence as the loss in value due to causes outside of the property, including the effect of supply and demand, government regulation, changes in operating costs, changes in interest rates, changes in employment, effect of zoning, the political climate, credit markets, and environmental concerns, among others. Tegarden testified that historically the most important factor for a utility, though, was government regulation. The theory behind Tegarden's method of measuring external obsolescence is that "a willing, informed buyer of a regulated utility will expect a market rate of return of net operating income." If the net operating income of the utility is more than the market rate of return, this will be reflected in external appreciation of the value of the operating property. On the other hand, if the net operating income is less than the market rate of return, this will be reflected in external depreciation of the value of the operating property. Tegarden contends that PacifiCorp's net operating income over the immediately preceding five-year period was 7.2%, while the net operating income for PacifiCorp's peer group, the expected market rate of return on net operating income, was 9.1%, resulting in a 20.88% negative difference between PacifiCorp's rate of return and the market rate of return.[8]

---

[8] In explaining his method of calculating external obsolescence, Tegarden stated:

This figure was rounded from 20.879%. Treating the 20.88% negative difference as economic obsolescence, Tegarden made an additional deduction of $2,325,180,010 in addition to the FERC Form's depreciation (*$11,135,919,587 x 20.88%=$2,325,180,010* (which was presumably rounded from $2,325,180,009.7656), resulting in a cost approach estimate of $8,810,739,577 (*$11,135,919,587 − $2,325,180,010=$8,810,739,577*).[9] Tegarden then rounded his cost approach estimate to $8,811,000,000.

With regard to Tegarden's income approach, he used the Yield Capitalization Method. The Yield Capitalization Method involves a determination of value based on cash flow divided by a capitalization rate of growth. Tegarden estimated cash flow, or net operating income, to be around $750,000,000, which included income for the existing plant, construction work in progress, and rate changes. He further estimated that the capitalization rate[10] was 9.10%, resulting in a valuation estimate of $8,242,000,000.[11] Tegarden applied a 19% weight to the cost approach and a 81% weight to the income approach, resulting in a valuation of PacifiCorp's operating property as of January 1, 2008, of $8,350,000,000 (*19% x $8,811,000,000* (cost approach) *+ 81% x $8,242,000,000=$8,350,110,000,* which was rounded to *$8,350,000,000*).[12]

When asked why he afforded an 81% weight to his income approach estimate and only a 19% weight to his cost approach estimate, Tegarden stated that "investors in these types of

> A prospective purchaser of the operating electric property of PacifiCorp would require a market rate of return. If the net operating income for each of the last five years is divided by the average net plant which earned that income, the rate of return on assets can be calculated. The latest years, the latest five-year average, the latest three-year average, and five-year trend rates of return were 7.12%, 6.30%, 6.61%, and 7.23%, respectively. We selected 7.20% as representative of the rate of return level which can be reasonably expected for the Company. This rate of return is based on net operating income intended by the regulatory commissions to cover the cost of capital. If this 7.20% selected rate of return is compared with the investor required return of 9.10%, the achieved rate of return is 1.90% below the investor required return (*9.10%-−7.20%=1.90%*). This 1.90% deficiency in rate of return equates to a 20.88% obsolescence factor (*1.90% / 9.10%= 20.88%*).

[9] In his appraisal, Tegarden stated that his estimate of external obsolescence recognizes that PacifiCorp has earned, on average, less than the market required rate of return on its total net investment in plant and equipment. He further elaborated that part of his external obsolescence estimate is attributable to the exclusion of properties purchased with deferred income taxes from the rate base and the effects of competition.

[10] Tegarden based his capitalization rate estimate on the band of investment technique.

[11] Rudd estimated cash flow to be around $690,000,000 and the capitalization rate to be 8.89%, resulting in a valuation estimate of $7,761,529,809. Tegarden's cash flow estimate was larger than Rudd's because he attempted to account for future earnings anticipated as a result of the construction in progress and because his estimate included floatation adjustments, which are the expenses involved in issuing debt and equity.

[12] With regard to the weight afforded each approach in his appraisal, Tegarden mistakenly testified that he applied a 80% weight to his income approach and a 20% weight to his cost approach.

properties are more concerned about the future and what can be earned, the cash flow they can expect. They're not as concerned about historical cost, what was paid for the property. That's water over the dam."[13] To determine the market value of PacifiCorp's operating property in Idaho as of January 1, 2008, Tegarden accounted for the allocation factor and made various adjustments similar to those employed by Rudd to arrive at an estimate of $230,680,003.

Thereafter, the Commission presented its case and relied primarily on the appraisal and testimony of Rudd; the appraisal and testimony of D. Brent Eyre, a certified appraiser licensed in Utah and Washington; and the testimony of Dr. Ben Johnson, a consulting economist with Ben Johnson Associates, Inc.[14] In his appraisal, Eyre utilized the stock and debt approach. He also employed the HCDL Method with regard to his cost approach and the discounted cash flow methodology ("Discounted Cash Flow Method") with regard to his income approach. At trial, Eyre disagreed with both Rudd's and Tegarden's appraisals because they did not utilize the comparable sales approach or the stock and debt approach to valuation, contending that they could have factored in the sale of PacifiCorp to MidAmerican in March of 2006. Eyre also disagreed with Tegarden's deduction for external obsolescence, contending that the depreciation reported in the FERC Form accounts for all forms of obsolescence and that Tegarden's cost and income approaches should have factored in deferred income taxes as a form of additional income.

Eyre testified that the market to book value ratio, which the FERC Form presents a strong indication of, generally accounts for all forms of obsolescence. Under cross-examination, Eyre admitted that depreciation studies, from which the depreciation figures in the FERC Form are calculated, generally occur every four or five years. Regarding the main differences between Tegarden's and Eyre's income approaches, Tegarden factored in float costs with regard to the

---

[13] With regard to weighing the indicators of value, Tegarden stated that "throughout the appraisal process, the appraiser is making decisions, judgments, and evaluating the relevance, importance, and reliability of the data used in each approach." "[R]econciliation[, which is the process by which an appraiser subjectively weighs the various approaches to valuation,] is not a mathematical exercise but rather a serious judgmental exercise by the professional appraiser to reach a logical conclusion of value." In this regard, the appraiser must place the most emphasis and weight on the approach with the strongest and most supportable market evidence.

[14] Dr. Ben Johnson, who is the president of Ben Johnson, Associates, Inc., is a consulting economist. He is not a certified appraiser and holds no accounting degrees. Johnson contended that "[a]s an economist and an observer of market values through [his] work, [he has] . . . some understanding of market values." as to whether it, in fact, precisely picks up every possible form of obsolescence, I don't think you can assert that." Johnson also admitted that depreciation studies generally occur every 4 or 5 years. He further testified that Tegarden should have accounted for PacifiCorp's deferred income taxes in his net operating income estimate.

9

Yield Capitalization Method while Eyre accounted for around a 2% rate of growth in perpetuity in his net operating income calculation with regard to the Discounted Cash Flow Method. After weighing his estimates accordingly, Eyre arrived at a cost approach estimate of 11,135,900,000, which was afforded a 20% weight; an income approach estimate of $11,372,200,000, which was afforded a 50% weight; and a stock and debt approach estimate of $11,393,700,000, which was afforded a 30% weight, resulting in an estimated unit value for all of PacifiCorp's 2008 operating property of $11,007,000,000 and an Idaho taxable value, after the allocation factor and the adjustments were made, of $412,300,000.

The district court entered its Memorandum of Findings of Fact and Conclusions of Law on September 16, 2010, holding that PacifiCorp established by a preponderance of the evidence that the Commission's valuation was erroneous.[15] The district court then entered its Judgment on October 19, 2010. The Commission thereafter timely filed its Notice of Appeal on November 24, 2010, and Amended Notice of Appeal on December 13, 2010.

### III. ISSUE ON APPEAL

The issue on appeal is whether the district court's Judgment is clearly erroneous when it rejected the Commission's valuation approach and adopted PacifiCorp's valuation approach.

### IV. STANDARD OF REVIEW

PacifiCorp filed its Petition for Judicial Review of the Commission's appraisal of its operating property in the district court pursuant to I.C. § 63-409. Subsection (1) of that statute provides that "[t]he appeal may be based upon any issue presented by the taxpayer to the state tax commission and shall be heard by the district court in a trial de novo without a jury in the same manner as though it were an original proceeding in that court." In any appeal taken pursuant to I.C. § 63-409, the burden of proof to establish by a preponderance of evidence that the valuation is erroneous falls on the party seeking affirmative relief. I.C. § 63-409(2).

The district court held that PacifiCorp established by a preponderance of the evidence that the Commission's valuation was erroneous. "Findings of fact will not be set aside on appeal

---

[15] Specifically, the district court held that "in many respects[, this action] was a battle of the experts." It recognized that "[e]ach of the witnesses has considerable experience in his particular field. Nevertheless, having had the special opportunity of listening to each witness as he gave live testimony and was subjected to rigorous cross examination, the court was especially impressed by Mr. Tegarden and found his testimony and opinions to be more credible, more reliable, more persuasive, and entitled to greater weight than the testimony and opinions of the witnesses for the Tax Commission." The district court stated that it "reviewed the criticisms of Mr. Tegarden's valuations but [found] them to be unpersuasive." After evaluating all the evidence, the district court held that the Commission's valuation was erroneous and that based on a preponderance of the evidence, "Tegarden's estimate of the value of PacifiCorp's operating property as of January 1, 2008, is the most accurate estimate of value in the record."

unless they are clearly erroneous." *Kennedy v. Schneider*, 151 Idaho 440, 442, 259 P.3d 586, 588 (2011). This Court recognizes that "[a] trial court's findings of fact will be upheld on appeal[, and, therefore, are not clearly erroneous,] if the findings are supported by substantial and competent evidence. It is the province of the trial judge to weigh the conflicting evidence and testimony and to judge the credibility of witnesses." *The Senator, Inc. v. Ada Cnty. Bd. of Equalization*, 138 Idaho 566, 569, 67 P.3d 45, 48 (2003). "This Court exercises free review over the district court's conclusions of law to determine whether the court correctly stated the applicable law and whether the legal conclusions are sustained by the facts found." *Kennedy*, 151 Idaho at 442, 259 P.3d at 588.

## V. ANALYSIS

### A. The District Court's Judgment was not clearly erroneous.

In its opening brief, the Commission provides a list of reasons why it believes that Tegarden's cost approach to valuation is unreliable and therefore incompetent. As the district court recognized, this appeal represents, in many respects, "a battle of the experts." The district court was faced with the difficult task of evaluating competing theories of valuation that, for the most part, utilized generally accepted valuation theories. All the experts testified that their subjective appraiser judgments were utilized within the bounds of their respective professional standards. The experts for PacifiCorp and the Commission each have considerable experience in their particular fields. As such, the district court correctly understood that its only task was to "listen[] to each witness as he gave live testimony and was subjected to rigorous cross examination," and then render its decision after weighing the credibility of the experts, their appraisals, and their theories. The district court noted that it "was especially impressed by Mr. Tegarden and found his testimony and opinions to be more credible, more reliable, more persuasive, and entitled to greater weight than the testimony and opinions of the witnesses for the Tax Commission." Furthermore, the court determined that the criticisms of Tegarden's valuations were unconvincing.

On appeal the Commission argues that the Tegarden approach is so unreliable it is not competent evidence. But the Commission did not challenge the competency of Tegarden's testimony in the district court. Each of the arguments presented by the Commission relate solely to the credibility of expert witnesses, the probative value of their appraisals, and the utilization by the experts of their appraiser judgments in applying those theories. The Commission has

11

generally not provided this Court with any arguments relating to the district court's conclusions of law, which this Court can review de novo. Instead, the Commission's qualms with Tegarden's approach are factual in nature and go towards rebutting the credibility of Tegarden's testimony and his appraisal.

It is widely recognized that "evidence in order to be *admissible must be* competent, relevant, and material." *E.g.*, 53 C.J.S. *Libel and Slander; Injurious Falsehood* §335 (2012) (emphasis added); 53 C.J.S. *Licenses* §114 (2012); 29A C.J.S. *Eminent Domain* §600 (2012); *see also* Black's Law Dictionary 635 (9th ed. 2009) ("admissible evidence . . . Also termed competent evidence . . ."); Black's Law Dictionary 639 (9th ed. 2009) ("relevant evidence . . . also termed competent evidence."). The Idaho Rules of Evidence provide that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless . . . a timely objection or motion to strike appears of record, stating the specific ground of objection. . . ." Idaho R. Evid. 103.

On appeal, it is asserted that competency of evidence and credibility of witnesses are one and the same—that is incorrect. Competency is an evidentiary prerequisite to admission. If evidence is incompetent, it is the opponent's obligation to object to that evidence when offered for admission. Idaho R. Evid. 103. This Court will not consider objections to the admission of evidence that are not preserved in the record and that are raised for the first time on appeal. *E.g*, *State v. Perry*, 150 Idaho 209, 224, 245 P.3d 961, 976 (2010) ("Generally Idaho's appellate courts will not consider error not preserved for appeal through an objection at trial."). If the methods employed by Tegarden were so unreliable as to render them incompetent, then an objection to that effect should have been lodged with the district court when offered. But because the Commission failed to object and challenge the competency of Tegarden's approach below, this Court will not evaluate whether Tegarden's approach is competent. Instead this Court will assume that the evidence and testimony admitted in the trial court and not challenged as incompetent by the Commission is competent. Therefore, this Court's inquiry is limited to whether the district court's decision, based on the testimony and evidence received and not objected to, was clearly erroneous.

This Court, when it reviews a district court's decisions will uphold the trial court's factual findings unless clearly erroneous. Idaho R. Civ. P. 52(a). We recognize that "[i]t is the province of the trial judge to weigh the conflicting evidence and testimony and to judge the

12

credibility of witnesses." *The Senator, Inc.*, 138 Idaho at 569, 67 P.3d at 48. Evidence is substantial if "a reasonable trier of fact would accept it and rely upon it in determining whether a disputed point of fact has been proven." *Id.* This Court will not reweigh the evidence on appeal. *Gooby v. Lake Shore Mgmt. Co.*,136 Idaho 79, 82, 29 P.3d 390, 393 (2001).

The Commission asserts that Tegarden's appraisal is unreliable because his external obsolescence deduction was duplicative because the FERC Form properly accounted for all forms of obsolescence. The Commission also contends that Tegarden's appraisal is unreliable because it assumes that PacifiCorp will always lose money and does not sufficiently account for PacifiCorp's deferred income taxes. Furthermore, the Commission claims that Tegarden's appraisal is unreliable because it failed to employ either the comparable sales approach or the stock and debt approach to valuation and because it never specified the respective weights it employed when it reconciled the cost and income approaches, unlike the district court. Finally, the Commission argues that Tegarden's appraisal is unreliable because it is too subjective. As mentioned, the reliability of Tegarden's approach was an issue for the trial court to decide after weighing evidence and considering the testimony and credibility of the witnesses. For the reasons discussed below, the district court's decision finding Tegarden's approach more reliable than the approached proposed by the Commission was not clearly erroneous.

1. *It Was Not Clearly Erroneous For the District Court to Conclude That External Obsolescence Is Not Sufficiently Accounted for in the FERC Form.*

The Commission argues that because PacifiCorp's self-reported depreciation in the FERC Form already includes "obsolescence," it is improper for PacifiCorp to provide another deduction. With marginal elaboration, the Commission, as support for its proposition that depreciation in the FERC Form accounts for external obsolescence, cites to Title 18, Part 101 of the Code of Federal Regulations, which includes the term "obsolescence" within the definition of "depreciation."

Indeed, that statute does include "obsolescence" in its definition of depreciation. Evidence was presented at trial suggesting that "obsolescence," as applied in that statute, does not provide for all forms of obsolescence, including external obsolescence. All of the appraisers asserted that "obsolescence" in the FERC Form generally accounts for book depreciation of the operating assets and functional obsolescence, not external obsolescence. The Commission never rebutted these assertions. The Commission's expert appraisers both admitted that they would have accounted for external obsolescence had they found market evidence to support those

13

deductions, suggesting that they understood that the FERC Form did not incorporate all forms of obsolescence. On this point Dr. Johnson testified as follows:

> We know that in principle the intent of the regulatory process is to pick up all significant forms of obsolescence. There is no intent to exclude economic obsolescence [from the FERC Form]. But as to whether it, in fact, precisely picks up every possible form of obsolescence, I don't think you can assert that. I think it would be very fact specific as to the extent to which an independent judgment of obsolescence would or would not match the accounting rules.

In addition, the Commission's experts admitted that depreciation studies, which provide the basis for the depreciation figures in the FERC Form, generally occur every four or five years. Based on this testimony and the Commission's inability to provide adequate authority rebutting these assertions, we conclude that it was not clearly erroneous for the trial court to determine that "obsolescence," as it is defined in the FERC Form, does not account for economic obsolescence.

> 2. *It Was Not Clearly Erroneous for the District Court to Accept Tegarden's Approach Despite the Commission's Arguments that Tegarden's Appraisal Assumes that PacifiCorp Will Always Lose Money and That Tegarden Should Have Considered PacifiCorp's Deferred Income Taxes In His Cost of Capital Projection.*

The Commission contends that because Tegarden and McDougal testified that PacifiCorp will never recover its cost of capital from the rate base, Tegarden's appraisal is unreliable.[16] The Commission also asserts that Tegarden's appraisal is unreliable because it assigns no value to PacifiCorp's deferred income taxes. As support for its assertion, the Commission cites broadly to a confidential memorandum expressing PacifiCorp's confidence in its future financial prospects. It also points out that Dr. Johnson testified that by taking deferred income taxes into account, PacifiCorp's "real cost of capital is approximately. . . 7%, not 9.1%."

At trial, the Commission did not challenge the methods of Tegarden as incompetent—it now seeks to do so. Because the Commission failed to challenge the competency of the Tegarden approach below, we will not decide whether it was competent; only whether it was clearly erroneous for the trial court to conclude that it was more reliable than the approaches advanced by the Commission. The reliability and credibility of the methods employed are questions of fact that the district court was required to weigh and evaluate—to which we grant deference. In this

---

[16] The Commission stated, on several occasions, that it was confining this appeal to a discussion of Tegarden's cost approach. In fact, the Commission only provided this Court with one issue on appeal, "May PacifiCorp deduct obsolescence from the cost approach to value without offering evidence of the cause of the obsolescence, the quantity of the obsolescence, and that the asserted obsolescence actually affects the property?" Therefore, this opinion will only address cost of capital in relation to Tegarden's external obsolescence estimate.

"battle of the experts" the district court weighed the testimony and methods of each expert. After doing so, it found the Tegarden approach more reliable.

The Commission proposes that Tegarden's appraisal is unreliable because it assumes that PacifiCorp will never recover its cost of capital from the rate base. The Commission points to a few statements in the transcripts made by Tegarden. Those statements do not describe PacifiCorp's failure to recover its cost of capital in perpetuity. Tegarden's appraisal provided a cost of capital estimate of 9.1%, as of January 1, 2008. He utilized the band of investment technique to reach his cost of capital estimate. Furthermore, the record asserts that PacifiCorp has not been recovering its cost of capital from the rate base for a number of years. Tegarden's appraisal reflects those deficiencies. The Commission asserts that his projections suggest that PacifiCorp will never recover its cost of capital. As mentioned before, Tegarden's appraisal reflects that PacifiCorp has been unable to recover its cost of capital from its base rate as of January 1, 2008. The district court's finding that Tegarden's appraisal does not assert that PacifiCorp will never recover its cost of capital from its base rate is not clearly erroneous.

The Commission also bases its argument on appeal on Dr. Johnson's assertion that by classifying PacifiCorp's deferred income taxes as net operating income, it would necessarily change Tegarden's cost of capital calculation to 7%, as opposed to 9.1%. Dr. Johnson is an economist, not an appraiser or an accountant. Dr. Johnson testified that he was not rendering any opinion of value. He testified that "[a]s an economist and an observer of market values through my work, I have some understanding of market values. And I believe based on that understanding of market values that some of the discussion that's taking place, allegations of external obsolescence because of regulation, are mistaken." He further testified that he never provided a cost of capital study and that his projections only represent his opinions. Even though the Commission assured the district court that Dr. Johnson's testimony was not intended to establish valuation, the Commission seems intent on using it for that purpose on appeal. Despite the continued invitations to reweigh the evidence on appeal, this Court will not do so. It was not improper for the trial court to determine that Johnson's testimony had very little, if any, probative value in establishing the reliability of Tegarden's approach.

Finally, concerning the confidential memorandum, the Commission does not provide any argument as to the substantive value of that document with regard to Tegarden's appraisal. Instead, the Commission merely states that if this Court were to read that document, the

15

"Holmesian mystery" of PacifiCorp's market value will be solved. Yet, it was not clearly erroneous for the trial court to decide that future earnings envisioned in a ten year plan does not indicate value in any of the aforementioned approaches to valuation.

> 3. *It Was Not Clearly Erroneous for the District Court to Find Tegarden's Appraisal Reliable Even Though it Does Not Utilize the Comparable Sales or Stock and Debt Approaches to Valuation.*

The Commission contends that Tegarden's appraisal is unreliable because he did not employ either the comparable sales approach or stock and debt approach to valuation. The Commission claims that, pursuant to I.C. § 63-201(15) and IDAPA 35.01.03.217.02 (2007), Tegarden should have considered the $9,200,000,000 sale of PacifiCorp to MidAmerican's subsidiary in March of 2006 in its valuation.

Tegarden determined that the comparable sales approach and the stock and debt approach to valuation had limited usefulness with regard to determining the market value of PacifiCorp's operating property. With regard to the comparable sales approach, he asserted, "[t]here is a very limited amount of actual sales data to be used as an evidence of value for the valuation of major going-concern business enterprises such as public utilities." He further recognized that the comparable sales approach generally provides the primary indicator of market value in appraisals of properties that are not purchased for their income producing characteristics, that frequently sell in the market place, and that are the result of arm's length transactions between reasonably informed buyers and sellers. None of the experts refute that PacifiCorp was purchased by a subsidiary of MidAmerican as a long term investment, and that the sale price of PacifiCorp more accurately represented long-term investment value as opposed to market value. In fact, the parties don't dispute that around $1,074,000,000 of PacifiCorp's sale price represents intangible goodwill.

Tegarden did consider the comparable sales approach in his assessment of valuation and determined that it was not useful. Although the Commission's expert, Eyre, employed the stock and debt approach, the district court, Rudd, and Tegarden recognized that it had limited usefulness, primarily because PacifiCorp has no outstanding shares of stock and because of the large premium paid for PacifiCorp's shares of common stock. The Idaho Administrative Code does not require the use of the comparable sales approach. IDAPA 35.01.03.217.02 (2007). It requires only that an appraiser "will consider" that approach when making his or her appraisal. The district court, Rudd, and Eyre all choose not to use the comparable sales approach for the

16

same reason that Tegarden did not utilize that approach. Therefore, it was not clearly erroneous for the district court to find Tegarden's appraisal reliable; despite not utilizing the comparable sales or stock and debt approaches.

4. *The Commission's Argument that the Weight Tegarden Applied to His Cost Approach and Income Approach Estimates Varies from the Weights Employed by the District Court is Without Merit.*

The Commission next contends that Tegarden's appraisal is not reliable because the weights he afforded the cost and income approaches differ from the weights that the district court afforded those approaches in its Judgment. The district court recognized that Tegarden assigned the income approach an 81% weight and the cost approach a 19% weight. At trial, Tegarden testified that he assigned his income approach estimate an 80% weight and his cost approach estimate a 20% weight; he likely misspoke. With regard to the cost approach and income approach to valuation, Tegarden estimated that the market value of PacifiCorp's operating property was $8,811,000,000 and $8,242,000,000, respectively. After weighing these approaches and rounding his estimate, he arrived at a market value of $8,350,000,000. The only way Tegarden could have arrived at this rounded valuation was by utilizing a 19% weight for the cost approach and an 81% weight for the income approach (*19% x $8,811,000,000 (cost approach) + 81% x $8,242,000,000 (income approach) = $8,350,110,000* as opposed to *20% x $8,811,000,000 (cost approach) + 80% x $8,242,000,000 = $8,355,800,000*).[17]

---

[17] With regard to his rationale for utilizing or not utilizing the various approaches to valuation and affording them the weights that he did, Tegarden stated:

> The cost approach was analyzed in detail and given careful consideration. The cost of reproduction and cost of replacement were considered. Because the earnings base is limited to original cost less depreciation these costs should be given very little credence. The original cost less depreciation is considered the best starting point in the cost approach. However, due to the inability of the Company to consistently earn a market rate of return, it was necessary to estimate the amount of obsolescence present in the property. With the deduction of all forms of depreciation, the cost approach is an important indicator in determining the value of an electric company, and was given due consideration in the final estimate of value.
>
> The income approach was also given careful consideration. The potential income stream of the company has been analyzed. It was necessary to consider Company projections, rate case decisions, and other historical data in predicting future income. These estimates were correlated with our own estimates, based on our analysis of the expected earnings. The money market has been analyzed and much study given to the estimation of a reasonable rate of capitalization. A prospective purchaser of electric property would very carefully consider the earning capability of the property. The income approach is a strong indication of value, and it was given considerable weight in the final estimate of value.
>
> The sales comparison approach could not be used in the ordinary manner as there are no arm's length market value sales of truly comparable properties. The stock and debt approach was considered as a substitute for the sales comparison approach. The common stock is owned entirely

The Commission's witness, Rudd, testified that the weight afforded each approach is based primarily on appraiser judgment:

> [F]or many years, the Tax Commission applied a 50/50 weighting to the cost and income approach for electric utility properties. That 50/50 weighting I believe was upheld by the Board of Equalization decisions in the past. In 2007, I . . . changed the weighting slightly to a 45/55 weighting. I felt I could still do that.

The Commission concurred with Rudd and left the weights he applied to the cost and income approaches unchanged. Likewise, Tegarden corroborated Rudd's testimony:

> [T]hroughout the appraisal process, the appraiser is making decisions, judgments, and evaluating the relevan[ce], importance, and reliability of the data used in each approach . . . [R]econciliation[, which is another term for weighing,] is not a mathematical exercise but rather a serious judgmental exercise by the professional appraiser to reach a logical legal conclusion of value. Therefore the appraiser must place the most emphasis and weight of consideration with the strongest and most supportable market evidence.

Based on Tegarden's and Rudd's testimony, it is evident that an appraiser largely relies on his or her own judgments when he or she reconciles these approaches. The Commission's contention that there is some sort of discrepancy between Tegarden's appraisal and the district court's Judgment is without merit.

> 5. *The Fact that Tegarden Utilized His Appraiser Judgment when He Made His Appraisal Does Not Render the District Court's Reliance on Said Judgment Erroneous.*

The Commission asserts that Tegarden's external obsolescence estimate is too dependent on the expected rate of return and the required rate of return, which the Commission suggests Tegarden could easily manipulate, and that Tegarden's required rate of return of 9.10% differed significantly in terms of monetary value when it is compared with either Rudd's 8.89% required rate of return estimate or Eyre's 8.72% required rate of return estimate.

At trial, the Commission's expert Eyre testified: "[Appraisal practice is not an exact science,] it's fraught with numerous judgments [and] assumptions. And obviously, the reliability of an appraisal is based upon the validity and the ability of the appraiser to defend those

---

by MidAmerican Energy and is not traded in the securities markets. For this appraisal report, sale of PacifiCorp's common stock to MEHC was analyzed even though it is clear that the purchase was an investment value decision rather than a market value decision. Also, the stock and debt approach was considered but not believed to be a sound indicator in the final estimate of market value for this report. Therefore, we have not included the stock and debt approach as an indicator of market value for this appraisal report.

judgments and assumptions." This sentiment was repeated throughout the trial. In fact, Rudd testified that he would have accounted for external obsolescence, if he was satisfied that there was sufficient market evidence. In this vein, he stated as follows:

> If the market supported such a suggestion by the company that there was economic or external obsolescence and the market supported it, I mean, yeah, I would be happy as an appraiser to provide economic obsolescence adjustment if I felt as an appraiser that it was warranted and that there was market evidence that told me that it needed to be made. I have no problem with that.

Likewise, although Eyre testified that he believed that the FERC Form's depreciation accounts for all forms of obsolescence, he testified that the cost indicator has a large amount of subjectivity, which sometimes creates controversy. In describing the HCLD Method, he stated that "it's objective insofar as . . . if you use HCLD, you've got a very objective source to drive the numbers. It's subjective in the fact as to your analysis of those numbers and the relative nature of them as they relate to your observations of the market as a whole." Like Rudd, Eyre testified that he could find no market evidence indicating external obsolescence outside what was reported in the FERC Form. Based on these assertions, it was not erroneous for the district court to find that the decision to provide a deduction for external obsolescence is a product of appraiser judgment.

At no point was it suggested by the Commission that Tegarden is a "trailblazer" when it comes to appraising the operating assets of an electric company. He utilized many of the same methods and theories that Rudd and Eyre employed. Throughout, Rudd and Eyre testified that they believed that Tegarden's use of his appraiser judgment was misplaced or farfetched. But PacifiCorp countered these assertions by providing experts who testified as to the misuse of Rudd's and Eyre's appraiser judgments in their appraisals. The district court was faced with three equally compelling, yet generally subjective, appraisals. It rendered its decision based primarily on the soundness of Tegarden's theories and his ability to defend those theories and judgments during cross-examination.

Furthermore, the Commission's argument that Tegarden utilizes "obsolescence in the air"[18] to arrive at his estimate of external obsolescence is also unconvincing for the same reasons. The Commission is essentially reasserting that Tegarden's approach is too subjective.

---

[18] It is unclear whether "obsolescence in the air" is a term that the Commission made up for the purpose of this appeal. That term is generally used with regard to military defense systems.

The fact that Tegarden, Rudd, and Eyre arrived at different required rate of return estimates is irrelevant and only highlights the subjective nature of these *estimates* in general.

> 6. *The Commission's Suggestions to Make Tegarden's Appraisal More Reliable Are Not at Issue.*

The Commission suggests that Tegarden's appraisal can be made more reliable, if this Court would require PacifiCorp to provide evidence to show the causes of obsolescence, the quantity of obsolescence, and that obsolescence really affects the properties in question. The Commission claims that PacifiCorp only provided the district court with three causes of external obsolescence: regulatory law; the fact that the Commission does not allow for the inclusion of assets financed with deferred income taxes in the rate base; and economic lag. Again, this Court is not going to reweigh the evidence as to how Tegarden's approach could be made *more* reliable. This is a question of fact for the trial court to weigh and consider. After doing so, the district court determined that Tegarden, his methodologies, and his use of his appraiser judgment were more credible and reliable than the Commission's experts and their methodologies. The Commission has not provided any convincing argument or authority suggesting the district court's reliance on the aforementioned facts—which were not challenged as incompetent and therefore presumed to be competent for purposes of this appeal—amounted to a clearly erroneous judgment.

## VI. CONCLUSION

Because the district court's Judgment was not clearly erroneous and was supported by substantial and competent evidence, the Judgment of the district court is affirmed. Attorney's fees were not requested. Costs are awarded to PacifiCorp.

HORTON, J., concurring.

I join in the Court's opinion. I write separately in response to the dissent and because the majority opinion is much longer than it needs to be. Although the dissent had advanced powerful arguments as to why Tegarden's testimony ought not have been admitted, the Commission does not assert that the district court erred by admitting the testimony. Rather, the Commission argues that the district court erred by relying on that testimony. This argument fails to acknowledge the limited role of an appellate court.

Following trial, the district court found that Tegarden's testimony was more persuasive than that offered by the Commission. When this Court reviews a district court's determination of the value of a utility's operating property following a trial de novo, this Court must "defer to the

20

district court's findings of fact that are supported by substantial evidence." *Idaho Power Co. v. Idaho State Tax Comm'n,* 141 Idaho 316, 321, 109 P.3d 170, 175 (2005). Stated differently, this Court will set aside the district court's factual findings only if they are clearly erroneous. *McCormick Int'l USA, Inc. v. Shore*, 152 Idaho 920, 923, 277 P.3d 367, 370 (2012); I.R.C.P. 52(a).

I find it noteworthy that the Commission did not acknowledge the standard of review applicable to this appeal until oral argument. The phrases "substantial evidence" and "clearly erroneous" are nowhere to be found in its briefing. This glaring omission undoubtedly reflects the Commission's recognition that application of the governing standard of review dictates that PacifiCorp must prevail in this appeal. This inevitable result reflects two fundamental propositions: The valuation of PacifiCorp's operating property is a matter of expert opinion; and this Court is not free to second-guess the district court's determination that PacifiCorp's expert was more credible than those of the Commission. The balance of this concurrence merely explains the legal basis for these two propositions.

All pertinent sources of Idaho law – statutory, administrative rules and our previous decisions – recognize that placing a value on property is an exercise in professional judgment. The Idaho Code states that "'Appraisal' or 'real estate appraisal' means an analysis, opinion or conclusion relating to the value, nature, quality, or utility of specified interests in, or aspects of, identified real estate." I.C. § 54-4104(1). The administrative rules governing assessment of operating property expressly recognize that the appraisal report will reflect the appraiser's opinions. IDAPA 35.01.03.405.08 (2007) explains: "Reconciliation, also called correlation, is an *opinion* regarding the weight that should be placed on each approach. The appropriate weight to be given each indicator is based on the appraiser's *opinion* of the inherent strengths and weaknesses of each approach and the data utilized." (emphasis added). These rules also expressly confer discretion upon the appraiser to exercise judgment when arriving at a valuation. IDAPA 35.01.03.405.05 (2007), addressing the cost approach, provides "the appraiser *may consider* replacement, reproduction, original or historical cost." (emphasis added). IDAPA 35.01.03.405.05.b (2007), provides that "[c]onstruction work in progress *may be considered* in the cost approach" and IDAPA 35.01.03.405.05.c (2007) states that "[i]f obsolescence is found to exist, it *may be considered* in the cost approach." (emphasis added).

21

In *Idaho State Tax Comm'n v. Staker*, 104 Idaho 734, 737-38, 663 P.2d 270, 273-74 (1982), this Court quoted the Arizona Court of Appeals' summation in *State v. Rella Verde Apts. Inc.,* 544 P.2d 675, 681 (Ariz. Ct. App.1976): "Appraising is not an exact science, it is merely an estimate of value." Thus, evidence of valuation of property is the province of experts. As previously noted, the Commission does not assert that the district court erred by admitting Tegarden's testimony. Rather, the Commission invites this Court to conclude that the district court erred by relying on that testimony. This Court is not free to do so. "Once an expert's opinion is admitted, it is up to the trier of fact to weigh the opinion against any conflicting testimony. *City of McCall v. Seubert,* 142 Idaho 580, 585, 130 P.3d 1118, 1123 (2006)." *Coombs v. Curnow*, 148 Idaho 129, 137, 219 P.3d 453, 461 (2009). The citation in *Coombs* to *City of McCall* is significant, because there, the City made virtually the same argument as the Commission has advanced and we rejected the argument.

> The City argues that this Court should grant a new trial to determine the value of the Seubert property because the jury improperly relied on the flawed methodology of Seubert's appraisal expert, Mark Richey, in awarding her damages. Richey's methodology, however, was not flawed, just different. "[W]eighing the testimony of expert witnesses is uniquely within the competence of the trier of fact." *Rueth v. State,* 103 Idaho 74, 78, 644 P.2d 1333, 1337 (1982).

*City of McCall*, 142 Idaho at 585, 130 P.3d at 1123. This Court rejected the City's position, stating: "In essence, the City merely argues that *its* expert's appraisal of the Seubert's property is more reliable than Seubert's and, therefore, the jury erred in relying on Seubert's expert's valuation of the land." *Id*. at 586, 130 P.3d at 1124 (emphasis original). This Court could simply substitute party names in this appeal to arrive at the same conclusion.

Further, our decision in *City of McCall* is notable for its reliance on the earlier decision in *Rueth*, because that opinion is instructive as to the conclusion that this Court must reach. In *Rueth*, this Court noted that factual findings of a trial court will only be overturned if clearly erroneous, adding: "This standard of appellate review is salutory in effect, and reflects the view that deference must be afforded to the special opportunity to assess and weigh the credibility of the witnesses who appear before it personally." *Rueth*, 103 Idaho at 77, 644 P.2d at 1336 (citing *Jensen v. Bledsoe*, 100 Idaho 84, 593 P.2d 988 (1979)). After discussing the differing opinions advanced by the parties' respective expert witnesses, this Court concluded:

> The Department's argument overlooks the fact that weighing the testimony of expert witnesses is uniquely within the competence of the trier of fact. … In this case, the district court's decision not to follow [the Department's expert witness's] testimony completely, although disappointing to the Department, does not render its findings of fact clearly erroneous. Simply stated, each side's expert presented differing opinions to the district court based on differing methodologies, and it was within the sound discretion of the district court to accept or reject each expert's opinions.

*Id.* at 78, 644 P.2d at 1337.

The Commission could only prevail in this appeal if this Court abandoned our constitutional role as an appellate court and became a trial court. Today's decision reflects this Court's unwillingness to do so.

Justice EISMANN, CONCURS.

J. JONES, Justice, dissenting.

While I agree with much of what the Court says in its opinion regarding the Commission's handling of evidentiary issues in the district court,[19] I disagree with the ultimate conclusion reached in the opinion. The Commission presented only one issue on appeal:

> May PacifiCorp deduct obsolescence from the cost approach to value without offering evidence of the cause of the obsolescence, the quantity of the obsolescence, and that the asserted obsolescence actually affects the property?

I would hold that PacifiCorp failed to establish entitlement to a 20.88% reduction in the taxable value of its property under the cost approach, based on "external obsolescence." PacifiCorp's

---

[19] It may be that the Commission remembers when an assessor's appraisal of property was presumed correct and would only be overturned where the taxpayer was able to show by clear and convincing evidence that the assessor's evaluation "was manifestly excessive, fraudulent or oppressive; or arbitrary, capricious and erroneous resulting in discrimination against the taxpayer." *Merris v. Ada County*, 100 Idaho 59, 64, 593 P.2d 394, 399 (1979). That changed on April 8, 2003, when the Governor signed into law House Bill 302, emergency legislation that established a "preponderance of the evidence" standard for tax appeals. 2003 Idaho Sess. Laws, 703; I.C. § 63-409(2). As the statement of purpose accompanying the legislation said:

> This legislation changes the legal standard from one that requires proof that an assessment is manifestly excessive, arbitrary and capricious, or fraudulent and oppressive, to one that requires simply that the assessment is erroneous. It changes the burden of proof to satisfy that standard from a "clear and convincing" burden to the normal "preponderance of the evidence" standard applicable to most civil cases.

With this less favorable evidentiary standard, the Commission must step up its game by competently challenging questionable evidence submitted on behalf of a taxpayer.

23

claim for an external obsolescence deduction in the amount of approximately $2,325,180,010 cannot be sustained on either legal or factual grounds, in my estimation.

PacifiCorp's expert, Tegarden, utilized the income shortfall method to determine external obsolescence and to set a cost value for the company's taxable property. According to Tegarden, "generally external obsolescence is caused by governmental regulations, governmental restrictions, zoning, rent control, competition, changes in supply and demand, changes in the economy, and changes in interest rates or costs of capital," but "probably the main cause, is the regulatory aspects that affect PacifiCorp." This includes "the regulatory commission's specific exclusion of certain properties from the rate base, i.e. those properties financed by the funds provided by the deferral of federal income taxes." External obsolescence also includes regulatory lag—delay in getting new plant and equipment into the company's rate base. Tegarden projected that PacifiCorp could expect a 7.2% rate of return on its plant in service in 2008. He asserted that a PacifiCorp investor would expect a 9.1% rate of return. He then calculated external obsolescence as follows:

| | | |
|---|---|---|
| Expected Rate of Return on Plant in Service | | 7.20% |
| Rate of Return Required by Investors = | | 9.10% |
| Percent Actual Rate of Return of Investor Required Rate of Return = | | 79.12% |
| Percent Obsolescence in Existing Plant: | | |
| 100.00%    [minus] | 79.12%  = | 20.88% |

Tegarden testified that it is not necessary to identify each individual factor contributing to external obsolescence and the amount attributable to each. Rather, he merely performs a "complete-unit-concept appraisal" that attributes any deficiency between the 7.2% and 9.1% return rates to external obsolescence, thereby reducing the taxable value of PacifiCorp's property by 20.88%, resulting in a reduction of $2,325,180,010.

This income shortfall method of determining cost certainly simplifies matters for the taxpayer. There is no need to go into the excruciating accounting detail necessary to establish and document the depreciation of plant and equipment for income tax and regulatory purposes. The method relieves the taxpayer of the bother of specifically identifying the assets alleged to be affected by external obsolescence and quantifying the amount of obsolescence affecting any particular asset. You need only identify a projected rate of return and a rate of return that will

make investors happy and multiply the assets by the difference between the two in order to reduce your taxes—a sort of proof by smoke and mirrors approach. According to Tegarden, "[T]he higher [the projected rate of return], the lower the obsolescence." Conversely, the higher the rate of return that will keep investors satisfied, the more external obsolescence a company can claim and the less property tax it will be required to pay.

The district court concluded that Tegarden's cost approach was reasonable from an evidentiary standpoint and more persuasive than the approach advocated by the Commission. Therefore, PacifiCorp's cost analysis was adopted by the court. However, I find the approach lacking on both factual and legal grounds.

This Court has not previously dealt with the income shortfall method and, therefore, it is worth examining how other courts in PacifiCorp's service area have dealt with the issue. The decisions of those courts are not in any way binding on this Court but it certainly seems appropriate to consider how our sister states have ruled on similar claims made by this multi-state corporation.

The Commission cites *Pacific Power & Light Co. v. Dept. of Revenue, State of Oregon*, 775 P.2d 303 (Or. 1989). Pacific Power & Light Co. (Pacific) is a predecessor of PacifiCorp. In that case, PacifiCorp's predecessor did not specifically identify the income shortfall method. However, as here, both parties started with the depreciation reported on the company's annual FERC Form 1 filing. *Id.* at 307. In addition to the depreciation reflected on the FERC filing, Pacific claimed obsolescence for "property purchased with funds held for 'deferred income taxes' (DIT)" and for property purchases entitled to investment tax credits (ITC), which were treated the same way as DIT for regulatory purposes. *Id.* at 305, 307. Oregon's Tax Court considered the "obsolescence" label "to be misleading" but allowed the deductions for both DIT and ITC because Pacific was not able to earn on them. *Id.* at 307. The Oregon Supreme Court reversed, saying:

> The Department argues that this analysis results in a portion of the tangible assets of Pacific inappropriately being exempted from taxation. We agree. Accepting (as the Tax Court and the parties apparently did) the idea that what we are searching for is what a hypothetical willing buyer of this property would pay to a hypothetical willing seller, it seems clear to use that a willing buyer of the plant and equipment would be agreeable to paying a figure close to [historic cost less depreciation], because the buyer could then earn off all that expenditure.

25

> We say "close," because there is much evidence in this record to the effect that regulation to some extent diminishes the earning potential of regulated property and, therefore, a willing buyer would wish to discount the property to some degree. Thus, Pacific's property may be affected by a measure of obsolescence. But—as the Tax Court recognized—DIT and ITC are no measure of (or surrogate for) that obsolescence. Both are property purchased through tax allowances for certain capital investments.
>
> Both DIT and ITC are property and have intrinsic value. . . . Absent any satisfactory evidence establishing an appropriate measure of obsolescence, it is inappropriate to make any deduction for it by subtracting *in toto* the values for DIT and ITC—the only deduction for which Pacific argues. We agree with the Department that the Tax Court erred in making the deduction.

*Id.* at 57−58. In the present case, Tegarden speculates that DIT is "one of the primary causes" of external obsolescence. However, there is no evidence in the record to establish an appropriate measure of external obsolescence of PacifiCorp's DIT assets, nor of the other assets claimed to be externally obsolescent, including the identity and value of those assets.

In a subsequent case not involving PacifiCorp or its predecessor, the Oregon Supreme Court declined to adopt the income shortfall method or "income-deficiency method" urged by the taxpayer. *Delta Air Lines, Inc. v. Dept. of Revenue, State of Oregon*, 984 P.2d 836, 849 (Or. 1999). The Court stated it was "unable to conclude from the evidence before us what type of obsolescence adjustment—if any—is required," based on that method. *Id.* The Court continued:

> [W]e find it significant that, as Delta's appraiser testified, by using the income-deficiency method, his cost indicator always would have equaled his income indicator, because his cost indicator measured obsolescence by examining the projected income stream. At best, therefore, Delta's *income deficiency method is illogical*, because it incorporates income figures that account for only owned assets, while it uses cost figures that account for both owned and leased assets. At worst, Delta's income-deficiency method strips the cost approach of its use as an independent determiner of value, because it always will track the result under the income approach.

*Id.* (emphasis added) Likewise, in this case, Tegarden's cost indictor measured obsolescence by examining the projected income stream.

Another PacifiCorp state, Montana, was no more enamored with the income shortfall method. In *PacifiCorp v. State of Montana*, *Dept. of Revenue*, 253 P.3d 847 (Mont. 2011), the Montana Supreme Court had before it several of the participants involved in the present case. Attorney David J. Crapo, who ably represented PacifiCorp in the present case, was counsel for

PacifiCorp, the appellant in the Montana case. Tegarden acted as PacifiCorp's expert and Eyre as Montana's. The Montana Tax Appeal Board rejected "the income shortfall method—the method advanced by PacifiCorp to demonstrate that about $2.6 billion worth of additional obsolescence existed." Of some interest is the fact that PacifiCorp did not appeal that decision. *Id.* at 853. Nevertheless, PacifiCorp contended that it was entitled to the additional deduction for external obsolescence, even though it was not disclosed on its FERC Form 1. *Id.* at 854.

The Montana Court accepted the Revenue Department's position that the FERC Form 1 reflected all forms of obsolescence since, as the Court pointed out, the FERC definition of depreciation included "wear and tear, decay, action of the elements, inadequacy, *obsolescence*, changes in the art, *changes in demand* and *requirements of public authorities*." *Id.* at 854 (emphasis in original). The Montana Court apparently read "requirements of public authorities," to equate to governmental regulations and restrictions. This certainly is a common sense reading. The Court went on to say, however, that additional reductions or adjustments might be made "if a taxpayer could show that additional depreciable value existed," but that PacifiCorp had failed to provide "a figure for how much obsolescence had not been captured." *Id.* The Court noted that the Tax Appeal Board had "rejected Tegarden's income shortfall approach because, among other reasons, it failed to account for income from properties that PacifiCorp had purchased with deferred income taxes." *Id.* According to the Court, "[a]bsent the evidence based on the rejected income shortfall method, [the Tax Appeal Board] had no evidence before it that suggested that unaccounted-for obsolescence existed." *Id.* at 855. The Court concluded, "PacifiCorp bore the burden of proving the Department's method inadequate. PacifiCorp came forward with no evidence of additional obsolescence that the Department had failed to analyze." *Id.* In this case, also, PacifiCorp made no accounting of income it may have received from properties that it had purchased with deferred income taxes and, more importantly, failed to identify and value DIT properties, or any other assets claimed to be externally obsolescent.

The Utah Supreme Court has similarly taken a skeptical view of claims asserting an entitlement to economic obsolescence deductions under the cost approach. In a case where a taxpayer claimed an economic obsolescence rate of 31%, the Court first cited a case involving a predecessor of PacifiCorp—*Utah Power & Light Co. v. Utah State Tax Comm'n.*, 590 P.2d 332 (Ut. 1979)—in which it had held that a taxpayer must not only show error in an assessment, but must also "provide a sound evidentiary basis upon which the Commission could adopt a lower

valuation." *Alta Pac. Assoc., Ltd. v. Utah State Tax Comm'n.*, 931 P.2d 103, 112 (Ut. 1997). The Court rejected the economic obsolescence claim stating:

> Nowhere in [Alta's] appraisals' explanation for its 31% economic obsolescence rate were the specific federal restraints mentioned. During their testimony, the owners' appraisal experts also failed to explain how each of the federal burdens impacted the appraisal. Thus, even if Sevier County's assessments were flawed for failing to account for each and every regulatory burden, reversal of the Commission's approval would be inappropriate because the owners failed to suggest a sound alternative method to correct the flaws.

*Id.* at 113.

The State of Arizona, which is also in PacifiCorp's service area, likewise takes a dim view of allowing a claim for external obsolescence where it is unsupported by actual proof. In *Eurofresh, Inc. v. Graham County*, 187 P.3d 530, 537 (Ariz. App. 2008), after citing a number of cases from other states, including Utah's *Alta Pacific* decision, the court said, "These authorities together teach that a taxpayer claiming external obsolescence must prove both the cause of the asserted obsolescence and that the subject property is actually affected by that cause." The court held that, "as a matter of law, a taxpayer claiming external obsolescence must offer probative evidence of the cause of the claimed obsolescence, the quantity of such obsolescence, and that the asserted cause of the obsolescence actually affects the subject property." *Id.* at 538.

The Commission proffered another decision from the same court, *Southwest Airlines Co. v. Arizona Dept. of Revenue*, 2012 WL 3041179 (Ariz. App. 2012), wherein Tegarden acted as expert for the taxpayer and Eyre acted as expert for the state.[20] The court noted that, "[i]n applying the cost method, Tegarden determined that additional deductions from the statutory formula were needed to account for obsolescence." *Id.* at 4. The court continued:

> In its specific criticisms of Tegarden's opinions, the Department argues his reliance upon the income-shortfall approach to perform a cost valuation was erroneous. It argues Tegarden's analysis was flawed because, *inter alia*, rather than compare Southwest's income to the income of other airlines, Tegarden "created a comparison market by hypothesizing an entirely subjective figure for what he thought that [Southwest's] earnings should be and compared the hypothetical earnings to its actual earnings." The tax court accepted Eyre's criticism of this method as circular.

---

[20] It should be noted that the *Southwest* decision contains a notice that "This decision does not create legal precedent and may not be cited except as authorized by applicable rules." With that cautionary note and with the understanding that, even without it, the decision is no way binding on this Court, it is interesting to get the Arizona court's take on the income shortfall method.

Moreover, the Department argues that the income-shortfall approach that Tegarden used has been rejected by the Western States Association of Tax Administrators. *See PacifiCorp*, 253 P.3d at 854−55 (rejecting use of income-shortfall approach); *Transcon. Gas Pipe Line Corp. v. Bernards Twp.,* 545 A.2d 746, 754 (N.J. 1988) (noting "circularity" of the approach).

*Id.* Thus, the court thought it inappropriate for Tegarden to hypothesize a subjective figure for what he thought the taxpayer's earnings should be and then compare the hypothetical earnings to its actual earnings in order to derive an external obsolescence deduction.

I agree with the skepticism expressed by these courts for allowing a large deduction of taxable value for external obsolescence, where there is no competent evidence to establish that the obsolescence actually exists. PacifiCorp postulates that it is entitled to a one-fifth reduction in the assessed value of its property under the cost approach because it is not achieving the rate of return its investors would prefer. The Commission characterizes PacifiCorp's position as using the "assumption of obsolescence to reduce the cost approach to the income approach." The Commission argues:

It does this by using the same "investor required rate of return" it used to develop the income approach. Stripped of its gloss, the basic argument is: (1) the cost approach yields a value significantly higher than the income approach, (2) the reason for the discrepancy must be obsolescence, therefore (3) use the percentage difference between the assumed actual rate of return and assumed "investor required rate of return" to determine the assumed obsolescence. Now the income approach and cost approach agree. The reasoning is circular and has the result of gutting the cost approach to value by relying on a critical income approach factor to calculate the cost approach.

In my estimation, the income deficiency or shortfall method of establishing cost is unreliable, as a matter of law, where the taxpayer fails to establish the claimed obsolescence assumed by that method by offering competent evidence: to establish the factors comprising the claimed obsolescence, to identify the assets affected thereby, and to quantify the amount of obsolescence for each asset. The record here contains no such evidence. Thus, I would  hold, as have our sisters states in similar circumstances, that PacifiCorp has failed to carry its burden of establishing entitlement to an additional deduction for external obsolescence.[21]

---

[21] While I do not have a bone to pick with the district court's decisions in admitting or considering PacifiCorp's evidence, that evidence is simply insufficient, as a matter of law, to establish its entitlement to an external obsolescence deduction.

In this case, PacifiCorp merely speculates, through use of the income shortfall method, that some sort of external obsolescence is keeping it from making the amount of money it wants to make. It could be "competition, changes in supply and demand, changes in the economy, and changes in interest rates or costs of capital," but "probably" the main cause is the "regulatory aspects that affect PacifiCorp." The company contends that the depreciation it disclosed on its FERC Form 1 did not include external obsolescence but offers no explanation as to why it apparently ignored the FERC definition of depreciation—which includes "obsolescence, changes in the art, changes in demand and requirements of public authorities"—and failed to report those items. All of these elements appear to be included in Tegarden's description of external obsolescence, particularly the last element, which would seem to equate to governmental regulation. I am inclined to agree with the Montana Supreme Court that the amount a utility designates as depreciation on its FERC Form 1 includes all obsolescence unless the utility can establish through competent evidence that additional depreciable value actually exists. *PacifiCorp v. State of Montana,* 253 P.3d at 854. If PacifiCorp contends that a primary cause of its "lower-than-adequate rate of return on all property is the regulatory commission's specific exclusion of certain properties from the rate base, i.e., those properties financed by the funds provided by the deferral of federal income taxes," it would seem that such properties would easily be identifiable, that the amount expended upon them out of deferred income taxes could be quantified, and that the effects on earnings, both positive and negative, could be shown.[22] Instead, PacifiCorp urges a blue sky approach where none of this proof need be proffered.[23]

PacifiCorp contends that part of the external obsolescence results from regulatory lag—delay by regulators in getting property placed into the rate base. However, PacifiCorp fails to establish a value for this factor. PacifiCorp is perfectly capable of calculating a value for regulatory lag. In *Utah Power & Light Co. v. Idaho Public Utilities Comm'n.*, 102 Idaho 282, 284−85, 629 P.2d 678, 680−81 (1981), this Court overruled the Idaho Public Utilities Commission's decision denying PacifiCorp's predecessor a 1% factor in its allowed rate of return for regulatory lag or "attrition."[24] The Court further allowed a regulatory lag or attrition

---

[22] Such a showing would have the added benefit of establishing whether and to what extent such assets were located in Idaho.

[23] It isn't entirely clear how inclusion of DIT properties in the rate base would improve PacifiCorp's earnings when it is apparently earning less than its allowed rate of return. Some explanation and evidence in this regard would also be helpful and appropriate.

[24] Of interest is the Court's observation that:

allowance in a subsequent rate of return requested by Utah Power in *Utah Power & Light Co. v. Idaho Public Utilities Comm'n.*, 105 Idaho 822, 826−27, 673 P.2d 422, 427−28 (1983). If PacifiCorp's predecessor could document and quantify a regulatory lag factor in proceedings where it sought to increase its allowed rate of return, it certainly could do the same in a case where it seeks to decrease the amount of its property taxes by claiming regulatory lag.

Before concluding, an observation regarding Tegarden's use of the income deficiency method is appropriate. In support of his calculation of external obsolescence, Tegarden cites The Valuation of Real Estate, 3ʳᵈ, by Ralph A. Ring and James H. Boykin. In his appraisal, Tegarden includes an example from page 424 of the Ring and Boykin publication, demonstrating the calculation of external obsolescence. The example shows a 2% loss in earnings resulting in a 17.4% deduction  for external obsolescence, calculated "by the difference in the *rate* of return allowed by regulatory agencies and the rate of the return that the investment market indicates as competitive to attract a willing, able, and informed purchaser (investor)." Yet, instead of using PacifiCorp's allowed rate of return as of January 1, 2008, the Commission's valuation date of the property, which the Commission points out was 8.27%, Tegarden used a projected rate of return based on PacifiCorp's five previous years of actual earning experience. Tegarden provided no explanation as to the departure from the methodology utilized by Ring and Boykin. We are left to speculate.

The Commission's regulations for assessment of utility company operating property certainly contemplate the possibility of a deduction for obsolescence. Rule 405.05.c provides:

> The appraiser shall attempt to measure obsolescence, if any exists. If obsolescence is found to exist, it may be considered in the cost approach.

IDAPA 35.01.03.405.05.c. Here, the Commission's appraiser did not find obsolescence to exist, other than as may have been claimed by PacifiCorp in its FERC Form 1. To obtain the benefit of any additional obsolescence that PacifiCorp may have neglected to include in the FERC Form 1, despite the FERC definition of depreciation, it was incumbent upon PacifiCorp to establish through competent evidence the factors comprising the claimed obsolescence, the amount attributable to each factor, and the effect on earnings, both positive and negative, of each factor.

---

> A rate of return authorized by a Commission is not a guarantee of any level of revenues. . . .
> Conflicting views exist as to whether a utility's failure to earn an authorized rate is, in and of
> itself, the final test of [regulatory lag].

*Id.* at 285, 629 P.2d at 681.

PacifiCorp has failed to do so and, therefore, I would reverse the district court's holding adopting PacifiCorp's cost valuation.

Chief Justice BURDICK CONCURS.